UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| NELLY ZELAYA, on behalf of herself, all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FOOT LOCKER, INC., et al.,<br><br>Defendants. | Case No. 5:17-cv-03279-EJD<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 23 |

Plaintiff Nelly Zelaya worked at a store owned by Defendants Foot Locker, Inc., Foot Locker Retail, Inc., Foot Locker Corporate Services, Inc. and Foot Locker Specialty, Inc. (collectively, "Foot Locker"). She alleges in this putative class action that Foot Locker required her to sign a consent form during the employment application process which violated the Fair Credit Reporting Act ("FCRA") and other related California statutes.

Federal jurisdiction arises under 28 U.S.C. §§ 1331 and 1367. Presently before the court is Foot Locker's Motion for Summary Judgment on all of Plaintiff's causes of action. Dkt. No. 23. Plaintiff opposes the motion. The parties argued the matter on May 24, 2018.

On this undisputed factual record, Plaintiff cannot prove Foot Locker is liable under any of the statutes asserted in the Complaint. The summary judgment motion will be granted for the reasons explained below.

**I.  BACKGROUND**

**A.  Plaintiff's Employment with Foot Locker**

Plaintiff was hired by Foot Locker in June, 2015, and worked as an hourly, part-time associate until October, 2016. During the application process, Plaintiff completed a form entitled

Case No.: 5:17-cv-03279-EJD
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
1

1  "Consent to Request Consumer Report & Investigative Consumer Report Information" (the

2  "Consent Form"). Defs.' Mot., Dkt. No. 23, at Ex. D. Plaintiff agreed to the following statements

3  by signing the Consent Form, among others:

> I understand that Foot Locker, Inc. and its subsidiary companies ("COMPANY") will use Sterling InfoSystems Inc. . . . to obtain a consumer report and/or investigative consumer report ("Report") as part of the hiring process. I also understand that if hired, COMPANY may, to the extent permitted by law, obtain additional Reports from STERLING for purposes of evaluating me for promotions, reassignment or retention as an associate.
>
> I understand Sterling InfoSystems Inc.'s ("STERLING") investigation may include obtaining information regarding my character, general reputation, personal characteristics and standard of living and criminal record, subject to any limitations imposed by applicable federal and state law. I understand such information may be obtained through direct or indirect contact with public agencies or other persons who may have such knowledge. If an investigative consumer report is being requested, I understand such information may be obtained through any means, including but not limited to personal interviews with my acquaintances and/or associates or with others whom I am acquainted.
>
> The nature and scope of the investigation sought is indicated by the services below:
>
> - Criminal Background Check
> - SSN Trace
> - Sex Offender Search
>
> . . . .
>
> I hereby consent to this investigation and authorize COMPANY to procure a Report on my background.

20  Plaintiff alleges the Consent Form is legally defective. She also alleges that "Defendants'

21  records admittedly indicates [sic] that they have conducted a background check on Plaintiff" based

22  on the Consent Form. Compl., at ¶ 24.

**B.   Foot Locker's Work Verification Process**

24  Despite her allegations, there is now no dispute that Foot Locker never obtained a

25  "background check" from Sterling InfoSystems concerning Plaintiff before she was hired. Trigo

26  Decl., Dkt. No. 23, at ¶ 8. In fact, uncontroverted testimony from Foot Locker's corporate

27  representative indicates the company does not obtain background reports for retail applicants

28  Case No.: 5:17-cv-03279-EJD
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
2

seeking employment as part-time sales associates like Plaintiff. Trigo Decl., at ¶ 4; Trigo Dep., Dkt. No. 37, at 19:2-8. Instead, the evidence shows that Foot Locker obtained a report from another company, TALX Corporation, after Plaintiff was hired. Trigo Dep., Dkt. No. 37, at 101:1-102:19; Segal Decl., Dkt. No. 35, at Ex. 1.

Foot Locker has engaged TALX to provide electronic "onboarding" services for new employees, a process that involves "integrating employees into the organization by allowing administrators and newly hired employees to complete employment forms online using electronic signatures." Sinatra Decl., Dkt. No. 37, at Ex. 5. One of the forms available electronically through TALX is the Form I-9. Id. ("The Form I-9 process allows Client to complete the Form I-9 electronically . . . and utilize the optional integration with the federal E-Verify program to verify the work authorization status of eligible employees."). Employers must use the Form I-9 to verify an employee's eligibility to work. See 8 C.F.R. § 274a.2. Verification can be accomplished through a government-sponsored system known as E-Verify, "a program that electronically confirms an employee's eligibility to work in the United States after completion of Form I-9." Sinatra Decl., Dkt. No. 37, at Ex. 2; Exec. Order No. 12,989, 61 Fed. Reg. 6091 (1996). "E-Verify works by electronically comparing the information from an employee's Form I-9 with records available to [the Social Security Administration] and [the Department of Homeland Security] to verify the identity and employment eligibility of each newly hired employee . . . ." Sinatra Decl., Dkt. No. 37, at Ex. 3. TALX acts as an "employer agent" when interfacing with E-Verify on Foot Locker's behalf. Id. at Ex. 2.

An electronic Form I-9 was completed through TALX using Plaintiff's name, address, birthdate, Social Security number, citizenship status, and driver's license information as required by the form. Id. at Ex. 7. After accessing E-Verify, TALX returned a "summary result" or "summary screen" with the following notation under Plaintiff's identifying information: "Employment Authorized."

### C. The Instant Action

Foot Locker removed this action from Santa Clara County Superior Court on June 7, 2017.

Case No.: 5:17-cv-03279-EJD
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
3

Plaintiff asserts five causes of action: two for violations of the Fair Credit Report Act ("FCRA"), one for violation of the Investigative Consumer Reporting Agencies Act ("ICRAA"), one for violation of the Consumer Credit Reporting Agencies Act ("CCRAA"), and one under the Unfair Competition Law ("UCL").

Foot Locker filed an Answer to the Complaint on June 14, 2017. Dkt. No. 9. This motion followed.

## II. LEGAL STANDARD

A motion for summary judgment or partial summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).

The moving party bears the initial burden of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the issue is one on which the nonmoving party must bear the burden of proof at trial, the moving party need only point out an absence of evidence supporting the claim; it does not need to disprove its opponent's claim. Id. at 325.

If the moving party meets the initial burden, the burden then shifts to the non-moving party to go beyond the pleadings and designate specific materials in the record to show that there is a genuinely disputed fact. Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 324. A "genuine issue" for trial exists if the non-moving party presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, the mere suggestion that facts are in controversy, as well as conclusory or speculative testimony in affidavits and moving papers, is not sufficient to defeat summary judgment. Id. ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than

Case No.: 5:17-cv-03279-EJD
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
4

simply show that there is some metaphysical doubt as to the material facts."); Thornhill Publ'g Co. v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979). Instead, the non-moving party must come forward with admissible evidence to satisfy the burden. Fed. R. Civ. P. 56(c).

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc., 210 F.3d 1099, 1103 (9th Cir. 2000). "But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." Id.

## III. DISCUSSION

The court first addresses Foot Locker's challenge to Plaintiff's Article III standing because the issue is jurisdictional. See Laub v. U.S. Dep't of the Interior, 342 F.3d 1080, 1085 (9th Cir. 2003); see also Moore v. Maricopa Cty. Sheriff's Office, 657 F.3d 890, 895 (9th Cir. 2011) ("A federal court cannot assume subject-matter jurisdiction to reach the merits of a case.").

### A. Standing

#### i. Governing Authority

The constitutional standing doctrine "functions to ensure, among other things, that the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 191 (2000). It "is a doctrine rooted in the traditional understanding of a case or controversy" and "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." Spokeo v. Robins, 136 S. Ct. 1540, 1547 (2016) ("Spokeo").

Generally, the inquiry critical to determining the existence of standing under Article III of the Constitution is "'whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.'" Allen v. Wright, 468 U.S. 737, 750-51 (1984) (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)). Three basic elements must be satisfied: (1) an "injury in fact," which is neither conjectural or hypothetical, (2) causation, such that a causal connection between the alleged injury and offensive conduct is established, and (3) redressability, or a likelihood that

Case No.: 5:17-cv-03279-EJD
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
5

the injury will be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

The party asserting federal jurisdiction must carry the burden of establishing standing under Article III. DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341 (2006). A basis for standing must persist at all stages of litigation. Hollingsworth v. Perry, 570 U.S. 693, 704 (2013). Furthermore, "[i]n a class action, standing is satisfied if at least one named plaintiff meets the requirements." Bates v. United Parcel Serv., Inc., 511 F.3d 974, 985 (9th Cir. 2007).

### ii. Application

Foot Locker argues Plaintiff cannot establish Article III standing under the FCRA because she did not suffer any damages as a result of the Consent Form's alleged defects. Plaintiff concedes the lack of damages. This concession, however, does not preclude the existence of an injury in fact under the FCRA.

This issue was clarified in Spokeo. There, the Supreme Court held that "[t]o establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" 136 S. Ct. at 1548. The Court explained further that an injury is "concrete" for Article III standing if it is de facto, such that "it must actually exist;" it must be "'real,' and not 'abstract.'" Id. In the context of a statutory violation, a plaintiff cannot simply "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." Id. at 1549. But "'[c]oncrete' is not . . . necessarily synonymous with 'tangible.'" Id. To determine whether an intangible harm constitutes an injury in fact, "both history and the judgment of Congress play important roles." Id.

"[T]he purpose of the FCRA . . . is 'to protect consumers from the transmission of inaccurate information about them.'" Carvalho v. Equifax Info. Servs., LLC, 615 F.3d 1217, 1230 (9th Cir. 2010) (quoting Gorman v. Wolpoff & Abramson, LLP, 584 F.3d 1147, 1157 (9th Cir. 2009)). With amendments made to the FCRA in 1996, "Congress was specifically concerned that prospective employers were obtaining and using consumer reports in a manner that violated job

Case No.: 5:17-cv-03279-EJD
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
6

applicants' privacy rights." Syed v. M-I, LLC, 853 F.3d 492, 496 (9th Cir. 2017). The disclosure and authorization provision at issue in this case was "intended to address this concern by requiring the prospective employer to disclose that it may obtain the applicant's consumer report for employment purposes and providing the means by which the prospective employee might prevent the prospective employer from doing so - withholding of authorization." Id. It "creates a right to privacy by enabling applicants to withhold permission to obtain the report from the prospective employer, and a concrete injury when applicants are deprived of their ability to meaningfully authorize the credit check. Id. at 499. By providing a cause of action for FCRA violations, "Congress has recognized the harm such violations cause, thereby articulating a 'chain[ ] of causation that will give rise to a case or controversy.'" Id. (citing Spokeo, 136 S. Ct. at 1549).

Here, Plaintiff alleges Foot Locker required her to sign a form which violated the FCRA because it contained extraneous information not permitted by statute, such as jurisdiction-specific statements and a liability release. "This allegation is sufficient to infer that [Plaintiff] was deprived of the right to information and the right to privacy guaranteed" by the employment disclosure provisions of the FCRA. Id. Drawing all reasonable inferences in Plaintiff's favor, the court logically infers that Plaintiff "was confused by the inclusion of the liability waiver with the disclosure and would not have signed it had it contained a sufficiently clear disclosure, as required in the statute." Id. at 499-50. Thus, Plaintiff has sufficiently alleged the invasion of a legally protected interest that is actual and concrete for standing purposes.

### B. The Merits

#### i. The Consumer Reporting Claims

##### a. 15 U.S.C. § 1681b

The FCRA permits consumer reporting agencies ("CRAs") to furnish a consumer report under certain circumstances. One of those circumstances is when the CRA "has reason to believe" the requesting party "intends to use the information for employment purposes." 15 U.S.C. § 1681b(a)(3)(B). But the FCRA requires the requesting party provide notice to the consumer before obtaining a report from a CRA, because "Congress was specifically concerned that

prospective employers were obtaining and using consumer reports in a manner that violated job applicants' privacy rights." Syed, 853 F.3d at 496. The statute provides, in pertinent part:

> [A] person may not procure a consumer report . . . for employment purposes with respect to any consumer" unless:
>
> (i) a clear and conspicuous disclosure has been made in writing to the consumer at any time before the report is procured or caused to be procured, in a document that consists solely of the disclosure, that a consumer report may be obtained for employment purposes; and
>
> (ii) the consumer has authorized in writing (which authorization may be made on the document referred to in clause (i)) the procurement of the report by that person.

15 U.S.C. § 1681b(b)(2).

### b. 15 U.S.C. § 1681d

Notice to the consumer is also promoted by § 1681d. The statute prohibits a requesting party from procuring a consumer report unless the consumer is (1) notified "that an investigative consumer report including information as to his character, general reputation, personal characteristics, and mode of living, whichever are applicable, may be made," (2) notified of the right demand a disclosure "of the nature and scope of the investigation requested," and (3) provided a "written summary of the rights of the consumer prepared pursuant to section 1681g(c)." 15 U.S.C. § 1681d(a).

### c. 15 U.S.C. §§ 1681n, 1681o

"The FCRA provides a private right of action against those who violate its statutory requirements in procuring and using consumer reports." Syed, 853 F.3d at 497. For a negligent violation, the consumer may recover actual damages and attorney's fees and costs. 15 U.S.C. § 1681o. For a willful violation, the consumer may recover statutory damages ranging from $100 to $1,000, punitive damages, and attorney's fees and costs. 15 U.S.C. § 1681n.

### d. ICRAA

The ICRAA provides consumer protections similar to the FCRA. The ICRAA prohibits a requesting party from procuring an investigative consumer report for employment purposes unless "[t]he person procuring or causing the report to be made has a permissible purpose," and "[t]he

person procuring or causing the report to be made provides a clear and conspicuous disclosure in writing to the consumer at any time before the report is procured or caused to be made in a document that consists solely of the disclosure." Cal Civ. Code § 1786.16(a)(2). An affected consumer may recover actual damages or $10,000, whichever is greater, as well as attorneys fees, costs, and punitive damages for willful violations. Cal. Civ. Code § 1786.50.

### e. CCRAA

The CCRAA requires, in relevant part, that:

> Prior to requesting a consumer credit report for employment purposes, the user of the report shall provide written notice to the person involved. The notice shall inform the person that a report will be used, and shall identify the specific basis under subdivision (a) of Section 1024.5 of the Labor Code for use of the report. The notice shall also inform the person of the source of the report, and shall contain a box that the person may check off to receive a copy of the credit report.

Cal. Civ. Code § 1785.20.5(a).

### f. Application

Foot Locker argues that Plaintiff cannot prove a violation of the FCRA, the ICRAA, or the CCRAA because there is no dispute of material fact that Foot Locker never procured a consumer report in relation to Plaintiff's employment. Because it would be Plaintiff's burden to prove her claims at trial, she must come forward with admissible evidence to show this fact is genuinely disputed. Celotex Corp., 477 U.S. at 323-24.

In an effort to do so, Plaintiff points to the "summary result" showing her legal authorization to work. Though Plaintiff agrees this information is not subject to the FCRA when obtained directly from the federal government, she believes the FCRA governs the release of the information when it is obtained from a third-party, like TALX. Plaintiff therefore argues that because TALX is a CRA, the "summary result" constitutes a "consumer report" under §§ 1681b and 1681d, an "investigative consumer report" under the ICRAA, and a "consumer credit report" under the CCRAA. The court, however, disagrees that Plaintiff's distinction makes any difference under the factual circumstances presented here.

Case No.: 5:17-cv-03279-EJD
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
9

Under the FCRA, a "consumer reporting agency" means:

> [A]ny person which, for monetary fees, dues or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

15 U.S.C. § 1681a(h).

A "consumer report" can be:

> [A]ny written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for . . . employment purposes.

15 U.S.C. § 1681a(d)(1).

Furthermore, the term "employment purposes," when utilized in connection with a consumer report, "means a report used for the purpose of evaluating a consumer for employment, promotion, reassignment or retention as an employee." 15 U.S.C. § 1681a(h).

Considering the statutory definitions, Plaintiff has not produced sufficient evidence on which a reasonable jury could find that TALX qualifies as a CRA or that the "summary result" constitutes a "consumer report" procured for "employment purposes." As noted, the evidence shows Foot Locker obtained one post-hire report concerning Plaintiff. This report came from TALX, which provides Foot Locker with work authorization information from E-Verify as part of its "onboarding" services for new employees. The report confirmed that Plaintiff is legally authorized to work in the United States, and there is no evidence that Foot Locker or TALX retained or used the report for any other purpose.

This process was consistent with the Memorandum of Understanding governing how Foot Locker and TALX can use of E-Verify. Pursuant to that agreement, Foot Locker may only use information from E-Verify "to confirm the employment eligibility of employees;" Foot Locker specifically may not "use E-Verify for employment pre-screening of job applicants, in support of

Case No.: 5:17-cv-03279-EJD
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
10

1 any unlawful employment practice," or for any reason not otherwise authorized by the rules that govern E-Verify's use. Sinatra Decl., Dkt. No. 37, at Ex. 2. In turn, TALX may only "create E-Verify cases using information provided by the Employer" and must "immediately communicate the responses back to the Employer." Id.

The undisputed facts underlying Plaintiff's claims fall outside of the FCRA's coverage. Looking first at the definition of "employment purposes," Foot Locker could not have used the "summary result" to evaluate whether to hire Plaintiff because she was already an employee by the time the information was procured, and there is no evidence Plaintiff was being considered for promotion or reassignment.

Moreover, a reasonable jury could not find that Foot Locker used the information it obtained from E-Verify to evaluate whether to "retain" Plaintiff, even drawing all reasonable inferences in Plaintiff's favor. As commonly understood, the word "evaluate" means "to determine the significance, worth or condition of usually by careful appraisal and study." Merriam-Webster's Collegiate Dictionary 432 (11th ed. 2003); United States v. Romo-Romo, 246 F.3d 1272, 1275 (9th Cir. 2001) (explaining that words in a statute should be given "their plain, natural, ordinary and commonly understood meanings"). Here, Foot Locker's use of the information it receives from E-Verify, as well as its response to the information, is limited by its Memorandum of Understanding with the federal government and the laws regulating the employment of unverified individuals. Under these restrictions, there is simply no opportunity or any reason for Foot Locker to apply "careful appraisal and study" to determine the significance of the information TALX acquires from E-Verify. Id. (prohibiting Foot Locker from taking any adverse action against an employee during the processing of an employment verification submitted through E-Verify); 8 U.S.C. § 1324a(a) (making it unlawful to employ or retain an alien for employment if the alien is not legally authorized to work).

Turning to the definition of "consumer reporting agency," the court declines Plaintiff's inference that TALX must be a CRA merely because it is a subsidiary of Equifax. See McLaughlin v. Liu, 849 F.2d 1205, 1207 (9th Cir. 1988) (holding the court need not accept

Case No.: 5:17-cv-03279-EJD
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
11

implausible inferences from circumstantial evidence on summary judgment). This inference is based only on circumstantial evidence; namely, a reference at the bottom of the "summary result" indicating that TALX "is a wholly owned subsidiary of Equifax Inc.," and a redirection notice from a website. Segal Decl., Dkt. No. 35, at Exs. 1, 2. Assuming Equifax qualifies as a CRA, Plaintiff has not cited any authority establishing that a CRA's subsidiaries are also CRAs as a matter of law. In any event, the record shows that Foot Locker contracted for "onboarding" services from TALX, not Equifax. No evidence in the record, circumstantial or otherwise, could support a finding that TALX "regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties" when it provides "onboarding" services to employers. Instead, the record shows that TALX provides a platform for newly-hired employees to complete hiring forms electronically and, as part of that service, acts as a conduit for the exchange of information between employers and E-Verify.[1]

Finally, Plaintiff has not met her burden to produce evidence on which a jury could find the "summary result" constitutes a "consumer report" under the FCRA. Since the definition of that term as applied in this case also encompasses the definitions of "consumer reporting agency" and "employment purposes," Plaintiff's failure to satisfy those definitions means her evidence must also fail to prove that Foot Locker procured a "consumer report."

In sum, the court finds there is no dispute of material fact that Foot Locker did not procure

---

[1] Given these facts, the Federal Trade Commission's Advisory Opinions on which Plaintiff relies are unhelpful to show that TALX is a CRA, though the court grants Plaintiff's request to judicially notice them.

In the LeBlanc opinion, the FTC noted the company at issue qualified as a CRA because it "assembled" criminal information supplied by individual record-searchers. Here, there is no evidence that TALX "assembles" information as part of the "onboarding" services it provides to Foot Locker. To the extent Plaintiff believes the "summary report" demonstrates that TALX "assembled" her personal information, the court observes the identifying information included on the report is the same information Plaintiff provided on the Form I-9. The record does not show that TALX independently obtained that information from any source other than Plaintiff.

As to the Goeke opinion, the FTC's statement that a "funneling" company would "probably" be a CRA has little, if any, persuasive value.

Case No.: 5:17-cv-03279-EJD
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

12

a "consumer report" for "employment purposes" during the "onboarding" process. Because the procurement of a consumer report is a precursor to liability under §§ 1681b and 1681d, Plaintiff cannot prove her causes of action under the FCRA.

Nor can Plaintiff prove her claims under the ICRAA or the CCRAA. Even if there is some distinction between these state authorities and the FCRA, the definition of "employment purposes" is consistent among all of them. See Cal. Civ. Code §§ 1785.3(f); 1786.2(f). Thus, for the same reasons explained with respect to the FCRA, Plaintiff cannot show Foot Locker obtained a consumer report for "employment purposes" under the ICRAA or the CCRAA.

The motion for summary judgment will be granted as to the first four causes of action.

### ii. The UCL Claim

The UCL prohibits business practices that are unlawful, unfair, or fraudulent. Cal. Bus. & Prof. Code § 17200. "Its purpose 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services,'" and its language is framed broadly in service of that purpose. Kwikset v. Super. Ct., 51 Cal. 4th 310, 320 (2011) (quoting Kasky v. Nike, Inc., 27 Cal. 4th 939, 949 (2002)). Injunctive relief and restitution are possible remedies for UCL violations. See Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1146 (2003).

Plaintiff's UCL claim falls under the "unlawful" prong, which "borrows violations of other laws and treats them as independently actionable." Daugherty v. Am. Honda Motor Co., Inc., 144 Cal. App. 4th 824, 837 (2006). Since it is "tethered" to the consumer reporting claims, this claim falls along with them.[2] Foot Locker is therefore entitled to summary judgment on the UCL claim.

## IV. ORDER

Based on the foregoing, Foot Locker's Motion for Summary Judgment (Dkt. No. 23) is

---

[2] In addition, Plaintiff's concession on damages precludes her from pursuing a UCL claim. Plaintiff seeks only restitution as a remedy under the UCL, but there is no evidence of money she paid to Foot Locker that could be ordered returned as a remedy. See Korea Supply Co., 29 Cal. 4th at 1144-45 (observing that a restitution order under the UCL is one "compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person").

Case No.: 5:17-cv-03279-EJD
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
13

GRANTED in its entirety. Since this order effectively resolves this action, judgment will be entered in favor of Foot Locker and the Clerk shall close this file.

**IT IS SO ORDERED.**

Dated: June 1, 2018

EDWARD J. DAVILA
United States District Judge